[No. D044663. Fourth Dist., Div. One. Dec. 9, 2005.]

RAMONA UNIFIED SCHOOL DISTRICT, Plaintiff and Appellant, v. GREGORY TSIKNAS et al., Defendants and Respondents.

512

COUNSEL

Stutz, Artiano, Shinoff & Holtz, Daniel R. Shinoff, Jeffery A. Morris, William C. Pate and David Estes for Plaintiff and Appellant.

Law Offices of James J. Moneer and James J. Moneer for Defendants and Respondents.

OPINION

**McDONALD, J.**—Plaintiff Ramona Unified School District (RUSD) sought to construct a school (the project) and, pursuant to the California Environmental Quality Act (CEQA), issued a mitigated negative declaration (MND) when it approved the project. However, when RUSD subsequently proposed a potential alteration to the project, defendant Neighborhood Alliance for Safe Ramona Schools (NASRS) filed a writ petition alleging RUSD's proposal violated CEQA, and sought an order setting aside the proposed change to the MND and requiring RUSD to prepare an environmental impact report (EIR) on numerous issues. The trial court rejected NASRS's writ petition, rejected NASRS's request for private attorney general fees, and dismissed the action.

RUSD then filed the present action, pleading causes of action styled as claims for abuse of process and barratry, and named as defendants NASRS, its principals, and its attorney (collectively defendants). Defendants moved to strike the complaint pursuant to Code of Civil Procedure section 425.16,[1] commonly referred to as the anti-SLAPP (strategic lawsuit against public participation) statute. (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 57 [124 Cal.Rptr.2d 507, 52 P.3d 685].) The trial court granted the motion, concluding RUSD could not show probable success on the merits, and subsequently awarded attorney fees to defendants. RUSD appeals.

I

FACTUAL AND PROCEDURAL BACKGROUND

A. *The Underlying Writ Proceeding*

RUSD's project was to acquire land for, construct, and operate an elementary school on Boundary Avenue in Ramona, California. In October 2000 RUSD approved the project and, to satisfy CEQA requirements, adopted an

---

[1] All statutory references are to the Code of Civil Procedure unless otherwise specified.

MND for the project. The MND stated the project would use a septic system for wastewater disposal. The limitations period for challenging the MND (Pub. Resources Code, § 21167, subd. (b)) expired before the end of 2000.

After the period for challenging the MND expired, Gregory Tsiknas and Charles Apgar (two of the principals of NASRS) continued to complain about the project to a variety of public agencies and individuals, and in particular raised concerns over traffic and access issues for the new school. Tsiknas and Apgar lived near the proposed school, and Tsiknas (having personally witnessed a fatal head-on collision at the intersection where school children would be picked up and dropped off) was particularly sensitive to traffic safety issues.

Sometime during 2002, RUSD explored the feasibility (as well as cost savings) of switching from the approved wastewater disposal system (a septic system) to an alternative system that would involve constructing a sewer pipe to connect to an existing sewer system operated by the Ramona Water District. On December 13, 2002, RUSD filed an addendum to the MND that described the intended change to the project and concluded the proposed change was not substantial and did not involve any significant environmental impacts that required preparation of any further CEQA documentation.[2]

On January 13, 2003, NASRS filed a writ petition challenging the December 13, 2003 addendum.[3] The petition asserted the use of the addendum was improper because it was an unlawful "piece-meal" review of the environmental impacts of the project, it was improper to treat construction of this sewer line as exempt under Public Resources Code section 21080.21, and it was improper to proceed by addendum because there was a fair argument the revisions to the project could cause significant impacts but there was no evaluation of the potential impact of the revisions. The petition requested an order requiring RUSD to set aside its addendum and to prepare an EIR on the issues raised by the petition.

On March 13, 2003, RUSD issued a revised addendum to the MND that evaluated the proposed change from septic to sewer (as well as expanding the

---

[2] The addendum also concluded the proposed sewer pipe would be CEQA-exempt (Pub. Resources Code, § 21080.21), and RUSD filed a notice of exemption for this sewer proposal. NASRS contended the proposed change was significant and nonexempt because of the collateral growth-inducing impact that would follow from extending sewer service through areas previously beyond the reach of the existing sewer service.

[3] On January 13, 2003, RUSD notified NASRS's counsel that it was in the midst of preparing an amended addendum that would supersede the December 13 addendum. However, NASRS's counsel decided that because the statute of limitations for challenging the December 13 addendum was about to expire, NASRS had to file its petition to preserve its ability to challenge RUSD's action.

sewer service area for the Ramona Water District to accommodate the school site) and reviewed the detailed design plans for conformance with the MND. The addendum continued to assert construction of the sewer line would have no new or substantially increased environmental effects beyond those discussed in the MND, and therefore no EIR or negative declaration was required under CEQA. In apparent response to the revised addendum, NASRS filed an amended petition on April 14, 2003. The first amended petition (in addition to updating the information concerning the date of the challenged action and the then current president of RUSD) restated the claims asserted in NASRS's original petition.

On May 23, 2003, RUSD filed a motion seeking judgment on NASRS's petition. RUSD asserted (1) the petition was moot because RUSD had decided two days earlier to abandon the sewer plan and to proceed with the project as originally designed and approved (and any CEQA challenges to the MND for original design were time-barred), and (2) even if RUSD were to implement the sewer related changes, the addendum was valid under CEQA standards. NASRS opposed the motion, asserting the petition was not moot because the addendum still proposed to annex the school site into the Ramona Water District (which would allow RUSD to switch back to sewer at a later date with no environmental review process) and because the MND had been limited to acquiring the land for the school while the addendum discussed construction of the school. The court ruled in favor of RUSD, concluding (1) all challenges to the MND for the project as originally designed were time-barred, (2) RUSD had no intention of pursuing a changed wastewater disposal plan, and (3) under CEQA the remaining elements described in the March 13, 2003 addendum could properly be considered by addendum.[4] However, NASRS sought and obtained leave to amend its petition.

NASRS's second amended petition alleged that, although the change from septic to sewer had been abandoned, the addendum remained operative insofar as it contained a detailed plan review, and RUSD's approval of the MND had been conditioned on the requirement for additional environmental analysis during detailed plan review. The second amended petition further alleged the original MND had been approved based on a traffic analysis that assumed traffic impacts of the school would be mitigated by providing access along both Boundary Avenue and Dye Road, but the addendum appeared to approve a design that abandoned any use of Dye Road and instead relied solely on Boundary Avenue for access. NASRS's second amended petition

---

[4] After the court issued its ruling, RUSD held a board meeting at which it clarified that "[a]ny and all formerly proposed changes to the Project addressed by the Addendum are no longer being pursued."

asserted this alteration was a significant change that was inadequately analyzed, and therefore it was improper to adopt such a change by addendum.

RUSD demurred to the second amended petition, asserting the trial court's ruling on the first amended petition (e.g., all challenges to the MND for the project as originally designed were time-barred and the elements remaining after elimination of the sewer proposal could properly be considered by addendum) was res judicata. The court, rejecting NASRS's argument that the addendum was subject to attack insofar as it altered the access plan contemplated by the MND, sustained RUSD's demurrer and dismissed NASRS's action. However, the court rejected RUSD's concurrent motion for sanctions, apparently brought under section 128.5 seeking to sanction NASRS for filing the second amended petition,[5] because the court was unwilling to find NASRS guilty of bad faith in filing the second amended petition.

NASRS then moved for attorney fees under the "private attorney general" statute. (§ 1021.5.) It argued that although its petition had been dismissed, the practical effect of its litigation was to force RUSD to withdraw its planned alterations to the project because it was the petition that induced RUSD to abandon changes to the project not evaluated through the CEQA process. The court denied the motion for fees, and also denied RUSD's cross-motion seeking sanctions, apparently brought under section 128.5 seeking to sanction NASRS for filing the attorney fees motion.[6]

B. *The Present Action*

RUSD then filed this action against NASRS, as well as against its principals Apgar and Tsiknas and its attorney in the underlying proceeding, Julie Hamilton, pleading causes of action labeled abuse of process and barratry premised on NASRS's challenges to the project. Defendants moved to strike the complaint under the anti-SLAPP statute, asserting the complaint arose out of activity within the ambit of the anti-SLAPP statute, thereby shifting to RUSD the burden to demonstrate probable success on the merits of the pleaded claims. Defendants argued that because RUSD could not meet that burden, the complaint should be stricken.

RUSD conceded the complaint was premised on activity covered by the anti-SLAPP statute, but asserted the motion should be denied because RUSD could show probable success on the merits. On the abuse of process claim, RUSD argued there was evidence showing defendants, by pursuing the second amended petition and the motion for private attorney general fees, had

---

[5] The record does not contain RUSD's September 19, 2003 motion for sanctions.

[6] The record does not contain RUSD's March 2004 motion for sanctions.

asserted claims so clearly unmeritorious that pursuing those claims constituted willful acts in the use of process not proper in the regular course of the proceedings. RUSD also argued the evidence showed these acts were pursued for the ulterior motive of harassing RUSD into abandoning the project or changing its location. RUSD argued these two elements sufficed to show probable success on the abuse of process claim. On the barratry claim, RUSD argued that because defendants "excited" three groundless proceedings (e.g., the original petition and the first and second amended petitions) with the requisite malicious intent, RUSD had presented sufficient evidence to show probable success on the barratry claim.

The trial court rejected RUSD's arguments, and granted defendants' anti-SLAPP motion. The court subsequently granted defendants' motion for attorney fees. (§ 425.16, subd. (c).) On appeal, RUSD asserts the trial court erred in granting the anti-SLAPP motion and further erred in awarding the attorney fees.

II

ANALYSIS

A. *The Anti-SLAPP Law*

■ The anti-SLAPP law provides that "[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).) The purpose of the statute is to encourage participation in matters of public significance by allowing a court to promptly dismiss unmeritorious actions or claims brought to chill another's valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances. (*Id.*, subd. (a).) In furtherance of this purpose, the anti-SLAPP statute is to be construed broadly. (*Ibid.*)

The anti-SLAPP law involves a two-step process for determining whether a claim is subject to being stricken. In the first step, the defendant bringing an anti-SLAPP motion must make a prima facie showing the plaintiff's suit is subject to section 425.16 by showing the defendant's challenged acts were taken in furtherance of constitutional rights of petition or free speech in connection with a public issue, as defined by the statute. (*Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 733 [3 Cal.Rptr.3d 636, 74 P.3d 737].)

RUSD concedes defendants satisfied the first step, which shifted the burden to RUSD to establish the second step by demonstrating it was reasonably probable it would prevail on the merits at trial. (§ 425.16, subd. (b)(1).) In this phase, the plaintiff must show both that the claim is legally sufficient and there is admissible evidence that, if credited, would be sufficient to sustain a favorable judgment. (*Wilcox v. Superior Court* (1994) 27 Cal.App.4th 809, 823–825 [33 Cal.Rptr.2d 446], disapproved on other grounds by *Equilon Enterprises v. Consumer Cause, Inc., supra*, 29 Cal.4th at ·p. 68, fn. 5; *Robertson v. Rodriguez* (1995) 36 Cal.App.4th 347, 358 [42 Cal.Rptr.2d 464].) In making this assessment, the court must consider both the legal sufficiency of and evidentiary support for the pleaded claims, and must also examine whether there are any constitutional or nonconstitutional defenses to the pleaded claims and, if so, whether there is evidence to negate those defenses. (*Traditional Cat Assn., Inc. v. Gilbreath* (2004) 118 Cal.App.4th 392, 398–399 [13 Cal.Rptr.3d 353].)

In considering whether a plaintiff has met the evidentiary burden, the court must consider the pleadings and the evidence submitted by the parties. (§ 425.16, subd. (b)(2).) However, the court cannot weigh the evidence (*Looney v. Superior Court* (1993) 16 Cal.App.4th 521, 537–538 [20 Cal.Rptr.2d 182]) but instead must simply determine whether the plaintiff's evidence would, if credited, be sufficient to meet its burden of proof. (*Wilcox v. Superior Court, supra,* 27 Cal.App.4th at pp. 823–825 [standard for assessing evidence is analogous to standard applicable to motions for nonsuit or directed verdict].)

On appeal, we review de novo the trial court's ruling on the motion to strike. (*Bernardo v. Planned Parenthood Federation of America* (2004) 115 Cal.App.4th 322, 339 [9 Cal.Rptr.3d 197].)

B. *The Gravamen of the Complaint Controls Application of the Anti-SLAPP Law*

■ The anti-SLAPP statute should be broadly construed (*Equilon Enterprises v. Consumer Cause, Inc., supra,* 29 Cal.4th at p. 60, fn. 3) and a plaintiff cannot avoid operation of the anti-SLAPP statute by attempting, through artifices of pleading, to characterize an action as a *garden variety* tort claim when in fact the liability claim is predicated on protected speech or conduct. (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 90–92 [124 Cal.Rptr.2d 530, 52 P.3d 703].) Thus, "a plaintiff cannot frustrate the purposes of the SLAPP statute through a pleading tactic of combining allegations of protected and nonprotected activity under the label of one 'cause of action.' " (*Fox Searchlight Pictures, Inc. v. Paladino* (2001) 89 Cal.App.4th 294, 308 [106 Cal.Rptr.2d 906].) We examine the *principal thrust* or *gravamen* of a

plaintiff's cause of action to determine whether the anti-SLAPP statute applies (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 78–79 [124 Cal.Rptr.2d 519, 52 P.3d 695]), and when the allegations referring to arguably unprotected activity are only incidental to a cause of action based essentially on protected activity, collateral references to unprotected activity should not obviate application of the anti-SLAPP statute to the complaint. (Cf. *Brenton v. Metabolife Internat., Inc.* (2004) 116 Cal.App.4th 679, 685–686 [10 Cal.Rptr.3d 702].)

## C. *RUSD's Abuse of Process Claim*

■ A claim for abuse of process arises when a party (1) for ulterior reasons (2) misuses the court's process for a purpose other than the purpose for which the process was designed. (*Brown v. Kennard* (2001) 94 Cal.App.4th 40, 44 [113 Cal.Rptr.2d 891].) RUSD argues it prima facie demonstrated both elements of abuse of process because there was evidence the defendants had ulterior motives (to harass RUSD into canceling the project) and misused the writ proceedings by pursuing claims (e.g., that the addendum changed the project and required RUSD reopen the environmental review process) defendants knew were substantively meritless.

Although initiating a meritless claim for an improper purpose can expose a party to damages for malicious prosecution, the mere initiation of a lawsuit, even for an improper purpose, does not support a claim for abuse of process. (*Oren Royal Oaks Venture v. Greenberg, Bernhard, Weiss & Karma, Inc.* (1986) 42 Cal.3d 1157, 1168–1169 [232 Cal.Rptr. 567, 728 P.2d 1202] (*Oren*).) Similarly, although continued prosecution of a claim after it becomes apparent the claim is meritless can expose a party to damages for malicious prosecution (*Zamos v. Stroud* (2004) 32 Cal.4th 958, 968–970 [12 Cal.Rptr.3d 54, 87 P.3d 802]), the "mere . . . maintenance of a lawsuit—even for an improper purpose—is not a proper basis for an abuse of process action" (*Oren, supra,* at p. 1169). RUSD cites no authority that the conduct here gives rise to a claim for abuse of process separate from and not subsumed within a malicious prosecution claim.

RUSD asserts that abuse of process, which has "evolved as a 'catch-all' category to cover improper uses of the judicial machinery that did not fit within the earlier established, but narrowly circumscribed, action of malicious prosecution" (*Barquis v. Merchants Collection Assn.* (1972) 7 Cal.3d 94, 104, fn. 4 [101 Cal.Rptr. 745, 496 P.2d 817]), can be asserted based on subsidiary acts occurring within the litigation. (*Adams v. Superior Court* (1992) 2 Cal.App.4th 521, 528 [3 Cal.Rptr.2d 49].) RUSD argues defendants' filing of the second amended petition and motion for attorney fees are subsidiary acts that support its claim for abuse of process. RUSD argues these acts employed

the court's processes for purposes other than that for which the processes were designed, asserting that once the trial court rejected the first amended petition based on statute of limitations (as to challenges to the MND for the project as originally designed) and mootness (based on RUSD's abandonment of the proposed change to the wastewater disposal plan), the proper course would have been to appeal that ruling. RUSD asserts that by instead pursuing a second amended petition, and by subsequently moving for attorney fees, defendants used the court's process in an improper manner within the meaning of a claim for abuse of process.

We are persuaded continued pursuit of meritless litigation for an improper collateral purpose, although actionable under malicious prosecution principles, is not separately actionable under an abuse of process theory. In *Tellefsen v. Key System Transit Lines* (1961) 198 Cal.App.2d 611 [17 Cal.Rptr. 919], the plaintiff filed an abuse of process claim alleging the defendant, after losing at trial, maliciously filed a frivolous appeal to coerce a cheaper settlement, and the continued prosecution of the action for a collateral purpose was an improper use of the judicial processes. The *Tellefsen* court concluded merely pursuing the appellate process, even if the appeal was deemed frivolous and pursued for an improper purpose, would not support a claim for abuse of process. (*Id.* at pp. 615–616.) We perceive no meaningful distinction between the continued frivolous prosecution of an action through invoking *appellate* remedies (e.g., appealing) that *Tellefsen* rejected as a basis for an abuse of process claim and the continued frivolous prosecution of an action through invoking *trial court* remedies (e.g., seeking to amend around the perceived deficiencies of the first amended petition), as occurred here.

The decision in *Oren, supra*, 42 Cal.3d 1157 provides additional support for our conclusion. In *Oren*, the plaintiff alleged its abuse of process claim was supported by the allegation that the defendant initiated and, despite losing in the trial court, continued to prosecute a CEQA action on appeal for the improper purpose of extorting a monetary settlement. *Oren* concluded neither the initiation nor the "maintenance of a lawsuit" supports an abuse of process claim. (*Oren*, at p. 1169.) *Oren* reasoned the elements applicable to a malicious prosecution claim strike the appropriate balance between the right to seek judicial relief and the right to be free from unjustifiable litigation, and to permit a plaintiff to recast the same claim as an abuse of process claim would improperly circumvent the protections inherent in the elements applicable to a malicious prosecution claim. (*Id.* at pp. 1169–1170.) As in *Oren*, defendants initiated a CEQA proceeding and, after the trial court ruled against them on their first amended petition, continued to pursue their CEQA claim, albeit by filing an amendment to *cure* the deficiency rather than by appealing to contest whether the first amended petition *was* deficient. However, there appears to be no principled basis to distinguish an amendment from an

appeal, at least insofar as would be meaningful for an abuse of process claim, and we therefore conclude *Oren* bars RUSD's effort to plead a claim for abuse of process.

RUSD's claim that the attorney fees motion was an abuse of process is unpersuasive. Even disregarding the absolutely privileged nature of this motion,[7] an abuse of process claim cannot be premised on merely seeking or obtaining a court ruling on a motion, but instead requires some proof there was a "subsequent abuse, by a misuse of the judicial process for a purpose other than that which it was intended to serve. [Citations.] The gist of the tort is the improper use of the process *after it is issued.* [Citation.]" (*Adams v. Superior Court, supra,* 2 Cal.App.4th 521, 530–531.) Because defendants' motion was unsuccessful, there was no legal process that was subsequently improperly used, and therefore RUSD's abuse of process claim is not well taken. (*Ibid.*)

■ The gravamen of RUSD's claim asserts it was injured by defendants' initiation or continued pursuit of meritless litigation for malicious purposes. We disregard RUSD's labeling and instead conclude the gravamen of RUSD's claim, although labeled a claim for abuse of process, is for malicious prosecution and is barred under *City of Long Beach v. Bozek* (1982) 31 Cal.3d 527 [183 Cal.Rptr. 86, 645 P.2d 137]. RUSD concedes that *Bozek* has definitively held a government entity may not institute a proceeding against a former plaintiff based on malicious prosecution because the constitutional right to petition would be improperly chilled if citizens were faced with the specter of defending a malicious prosecution claim if their petitioning activity was unsuccessful. (*Id.* at pp. 534–539.)

### D. *RUSD's Barratry Claim*

■ RUSD peremptorily argues on appeal that defendants are liable for barratry because they "excited" three groundless judicial proceedings with the intent to vex or annoy. We are satisfied that, apart from the numerous other defects in this claim,[8] the trial court correctly rejected this claim because

---

[7] The litigation privilege bars an abuse of process claim insofar as the claim is premised on conduct within the privilege (*Pollock v. University of Southern California* (2003) 112 Cal.App.4th 1416, 1429–1430 [6 Cal.Rptr.3d 122]), and the privilege extends to motions filed by persons seeking relief from a court. (*Adams v. Superior Court, supra,* 2 Cal.App.4th at pp. 528–532; accord, *Drum v. Bleau, Fox & Associates* (2003) 107 Cal.App.4th 1009, 1027–1028 [132 Cal.Rptr.2d 602] [applications for judicial orders fall within privilege].)

[8] RUSD does not explain how its barratry claim as against Attorney Hamilton survives the absolute privilege described in *Rubin v. Green* (1993) 4 Cal.4th 1187 [17 Cal.Rptr.2d 828, 847 P.2d 1044]. (See *Drum v. Bleau, Fox & Associates, supra,* 107 Cal.App.4th at pp. 1025–1026.) RUSD does not articulate how a citizen, whose lawsuits against a governmental entity are otherwise constitutionally privileged and insulated from malicious prosecution

there was but a single proceeding. A civil claim for barratry requires showing the defendant excited at least three groundless lawsuits (*Rubin v. Green, supra,* 4 Cal.4th at p. 1190; *Trear v. Sills* (1999) 69 Cal.App.4th 1341, 1358–1359 [82 Cal.Rptr.2d 281]), and the claim is unavailable when only a single lawsuit is alleged. (*Trear,* at p. 1359.) Although RUSD suggests each amendment to the writ petition qualified as a separate lawsuit or proceeding, thereby satisfying the quantitative threshold for a barratry claim, the plain language of the statute requires multiple suits or proceedings (*People v. Sanford* (1988) 202 Cal.App.3d Supp. 1, 4 [249 Cal.Rptr. 279]), and has never been applied to a single lawsuit. We decline RUSD's invitation to expand barratry to encompass a single maliciously prosecuted underlying lawsuit merely because the underlying defendant twice successfully demurred to the complaint and forced the underlying plaintiff to twice amend his pleading. Because RUSD's lawsuit seeks to pursue a claim barred under *Bozek,* and does not satisfy the requirements of a claim for barratry, the trial court correctly ruled RUSD could not satisfy its burden of showing probable success on the merits and therefore properly granted defendants' anti-SLAPP motion.

### E. *The Attorney Fees Award Was Not Error*

The anti-SLAPP statute provides "a prevailing defendant on a special motion to strike shall be entitled to recover his or her attorney's fees and costs." (§ 425.16, subd. (c).) RUSD argues the attorney fees award, insofar as the award encompassed fees for the time spent by attorney Hamilton in litigating the anti-SLAPP motion, was erroneous because *Trope v. Katz* (1995) 11 Cal.4th 274 [45 Cal.Rptr.2d 241, 902 P.2d 259] holds an attorney who represents him- or herself in propria persona is not entitled to be compensated for the time spent to litigate the lawsuit.[9]

We conclude, on the facts of this case, *Trope v. Katz* does not bar an award of attorney fees for Hamilton's legal services. The evidence filed in support of defendants' attorney fees motion showed, in response to RUSD's action against NASRS, Tsiknas, Apgar and Hamilton, all defendants retained Special Counsel James Moneer (an expert in anti-SLAPP motions) to pursue the anti-SLAPP motion, and he agreed to represent them at a discounted hourly rate with a contingent fee agreement for the balance of his fees. Additionally,

---

liability by *City of Long Beach v. Bozek, supra,* 31 Cal.3d 527, forfeits that protection because he or she has instituted serial constitutionally privileged lawsuits.

[9] RUSD's reply brief appears to contend Hamilton's fees should have been disallowed because she was admittedly inexperienced in litigating anti-SLAPP motions and the work she performed under the direction of primary counsel, James Moneer, was more akin to law clerk or clerical work rather than as lead attorney. RUSD cites no authority suggesting such work is not a compensable component of an attorney fees award, and in any event, we do not further consider this issue because it was raised for the first time in RUSD's reply brief.

Hamilton continued to represent NASRS, Tsiknas and Apgar by assisting Moneer's pursuit of that motion (contributing her expertise in environmental litigation to preparing the motion) to aid in the legal defense of NASRS, Tsiknas and Apgar (as well as herself) against RUSD's complaint.

■ "In [*Trope v. Katz*], we considered [the limited question of] whether an attorney who chooses to litigate in propria persona rather than retain an attorney to represent him [or her] in an action to enforce a contract containing an attorney fee provision can recover attorney fees under Civil Code section 1717." (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1092 [95 Cal.Rptr.2d 198, 997 P.2d 511].) *PLCM* pointed out "that, by definition, the term 'attorney fees' implies the existence of an attorney-client relationship, i.e., a party receiving professional services from a lawyer." (*Ibid.*, citing *Trope v. Katz, supra,* 11 Cal.4th at p. 280.) Where an attorney-client relationship exists, the courts uniformly allow for the recovery of attorney fees under Civil Code section 1717. (*PLCM, supra,* 22 Cal.4th at p. 1093 [party represented by in-house lawyers]; *Mix v. Tumanjan Development Corp.* (2002) 102 Cal.App.4th 1318, 1321 [126 Cal.Rptr.2d 267] [successful pro per litigant can recover attorney fees under Civil Code section 1717 for legal services of assisting counsel even though they did not appear as attorneys of record]; *Gilbert v. Master Washer & Stamping Co.* (2001) 87 Cal.App.4th 212, 220 [104 Cal.Rptr.2d 461] [attorney represented by other members of his or her own law firm entitled to recover contractual attorney fees].)

Cases that have allowed the recovery of attorney fees under the anti-SLAPP statute are similarly marked by the existence of an attorney-client relationship. (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1132–1134 [104 Cal.Rptr.2d 377, 17 P.3d 735] [defendant represented by a lawyer under a contingent fee arrangement entitled to attorney fees under the anti-SLAPP statute]; *Rosenaur v. Scherer* (2001) 88 Cal.App.4th 260, 283 [105 Cal.Rptr.2d 674] [attorney representing a defendant on a pro bono basis entitled to attorney fees under the anti-SLAPP statute]; *Dowling v. Zimmerman* (2001) 85 Cal.App.4th 1400, 1425 [103 Cal.Rptr.2d 174] [defendant initially appearing in propria persona but later retains specially appearing counsel who success-fully brings anti-SLAPP motion entitled to attorney fees for retained counsel]; *Macias v. Hartwell* (1997) 55 Cal.App.4th 669, 675–676 [64 Cal.Rptr.2d 222] [prevailing defendant under anti-SLAPP statute entitled to recover attorney fees paid by a third party].)

This decisional authority and the plain language of section 425.16, subdivision (c) support the conclusion that the commonly understood definition of attorney fees applies with equal force to section 425.16 and a prevailing defendant is entitled to recover attorney fees if represented by counsel. Here, the evidence supports the determination that Moneer was representing all

defendants in connection with the anti-SLAPP motion, and Hamilton rendered legal services to Moneer's nonattorney clients (e.g., NASRS, Tsiknas and Apgar) by assisting Moneer's successful defense against RUSD's suit. Because an attorney-client relationship existed between the prevailing defendants and Hamilton, *Trope* does not preclude the award of attorney fees merely because Hamilton was a codefendant with the nonattorney clients to whom she provided legal assistance.

DISPOSITION

The judgment is affirmed. Defendants are entitled to costs on appeal.

Nares, Acting P. J., and O'Rourke, J., concurred.